Meyer, J.
(dissenting). Harmless error analysis is not to be indulged in "unless the proof of the defendant’s guilt, without reference to the error, is overwhelming,” and when indulged in with respect to nonconstitutional error proscribes a conclusion that the error was not prejudicial "if the appellate court concludes that there is a significant probability, rather than only a rational possibility, in the particular case that the jury would have acquitted the defendant had it not been for the error or errors which occurred” (People v Crimmins, 36 NY2d 230, 241, 242). Because in my view this case meets neither test, I would reverse and order a new trial. I, therefore, dissent.
The majority states (at pp 864-865) that "[t]he victims were shot from behind at pointblank range”. While the evidence is that Theodore Gross sustained three bullet wounds to the back of the skull, the medical testimony was that only one was at pointblank range. And with respect to Melita Sneed, the *868 doctor testified only that there were three bullet fragments in her face and head, none of which were removed. Fragments are more consistent with the ricochet of the bullets fired at Gross after exiting his head and striking the windshield than with firing at both Gross and Sneed. That possibility is also more consistent with the testimony of Natchev, operator of the car wash across the street from the scene of the shooting that he "heard a puck, puck, puck,” which is evidence of but three shots, and with the fact that there were three separate entrance wounds on the back of Gross’ head. Whether Sneed was shot or injured by flying fragments of the bullets that killed Gross is important because if only Gross was shot, Murdock’s testimony that defendant had said to him just before they got into the car that "he was going to kill Ted Gross and the girl” is proved a lie; had defendant rather than Murdock been the shooter, there was no reason for him not to kill Sneed, as that statement indicated he intended, by shooting her "at pointblank range”. Murdock’s credibility was, therefore, clearly damaged by the doctor’s testimony. It was even more greatly damaged by the fact that he was the only other occupant of the back seat of the car and made no mention of defendant’s alleged statement to him until he had first told his parole officer and a detective that he was not present at the shooting, then after being given Miranda warnings "told them the truth” as to the shooting in a signed statement, and only about an hour and a half later called the detective back and told him of defendant’s statement. Of importance also in the evaluation of his testimony are the fact that although the People were careful in cross-examining defendant to establish that he was right-handed, they made no effort to establish that Murdock was not left-handed; that the doctor testified that at least two of the bullets went from right to left through Gross’ head, but said that he could not tell whether the weapon was fired from the left or right side of the car or by a left-handed or right-handed person; and that although the crime scene investigator testified that the crater in the windshield was 12 inches from the left side of the windshield and in his opinion was fired "in rather a direct line with the windshield,” which was equally consistent with the shooter being right-handed defendant or left-handed Murdock, he made no more effort to develop the angle from which the shot was fired than the People did to establish that Murdock was not left-handed.
As the majority notes (at p 866), Bobby Glover testified that *869 during the few hours he and defendant were both in the holding pen of the Criminal Court Building in Brooklyn, Glover to answer a criminal charge and defendant to meet with his lawyer concerning whether he would testify before the Grand Jury, defendant made the damning admissions to which Glover testified. Not only was the encounter thus a casual one of a few hours duration rather than continued, but also defendant denied knowing Glover previously or having the conversation Glover testified to or even being in the holding pen with Glover. Although Glover claimed to have known defendant from the Fort Greene area for about 18 months and to have had the holding pen conversation in the presence of Roger Lee, who, defendant conceded, was in the holding pen with him, the People never called Lee to establish whether Glover was there or, if he was, what conversation with defendant, if any, occurred in his presence. To the improbability that defendant would have given the detailed statement that Glover testified to a casual acquaintance, if Glover was that, in a casual encounter in a court holding pen, must be added, in evaluating whether the testimony was overwhelming, the failure to call Lee to corroborate Glover in any respect, as well as Glover’s past history as a criminal who knew the value of informing on others in return for money or the reduction of charges, or both. Only through Glover’s testimony that defendant "said Ted was screwing up the money from the narcotics” was there any evidence of a motive for killing Gross, and even that offers no basis for defendant’s alleged statement that "he was going to kill Ted Gross and the girl”. The importance of Glover’s testimony as to motive to the determination of guilt or innocence cannot be overemphasized, the more particularly because of its apparent inconsistency with the testimony of Gross’ wife that defendant was a friend of Gross’.
The only other factors pointing to defendant rather than Murdock as the shooter are the testimony of Melita Sneed that defendant bent over and said something like "[l]et me check my pistol” or "[l]et me check my gun” and then she heard a loud noise and saw a hole in the windshield, and the apparent absence of motive on Murdock’s part. But neither Murdock nor Sneed testified (notwithstanding Murdock’s position alongside defendant) to seeing a gun in defendant’s hand,[1] *870 nor was a gun ever found, and Sneed’s testimony was weakened by her admission that what she testified to was what she "vaguely” remembered and that she "couldn’t quite make out the conversation.” Neither that testimony nor Murdock’s absence of motive, by themselves or taken together with the questionable testimony of Murdock and Glover and the inconclusive medical and crime scene evidence, can be said to rise to the level of overwhelming proof of defendant’s guilt.
Nor can it fairly be said that there was not a significant probability of acquittal had the excluded evidence of Ms. Drayton and Sergeant Gathers been admitted. Glover not only furnished evidence of motive which no one else could, but furnished damning proof of consciousness of guilt, in addition to the alleged bribe offer, in the proposal that he, Glover, procure the murder of the two witnesses (presumably Sneed and Murdock) against defendant, and in defendant’s alleged attempt to hide at his uncle’s house only to be recognized by Sergeant Gathers as a fugitive from a New York murder charge. The excluded testimony of Sergeant Gathers that there never had been any bribe offer and that defendant had surrendered voluntarily in a parking lot near the police station within a few hours of arrival in Charleston rather than after being discovered in the home of his relative presented a significant probability that the jury may have rejected Glover’s triply incriminating story as out of the whole cloth and accepted defendant’s testimony that he did not know and had not met with or talked to Glover. To characterize the excluded evidence as harmless, as does the majority (at p 867), is to ignore the greater credibility that the jury would accord the testimony of the Charleston police sergeant (notwithstanding his friendship with defendant’s school teacher uncle) than it would that of defendant, defending himself against the possibility of a murder conviction.
The error in excluding Gathers’ evidence was compounded by the exclusion of Ms. Drayton’s testimony that she had informed defendant’s mother-in-law that the police were looking for him with shotguns, for it prevented defendant from offering his explanation of the reason for his flight to South Carolina which, the court in its charge advised them, was to be weighed against the evidence of flight itself.* [2] The value of *871 the error to the prosecutor’s summation is evident from his statements to the jury that defendant "fled to South Carolina when he knew the police were looking for him” and that "he left town * * * as Bobby Glover told you because he shot and killed Ted Gross”.
It would, indeed, be unfortunate if this case, which has been tried four times, had to be returned for yet a fifth trial, but it would be even more unfortunate were defendant, who has already been incarcerated for nine years, to be deprived of his liberty without the fair trial that due process requires. We have recognized that "the Sixth Amendment to the United States Constitution, obligatory on the States through the due process clause of the Fourteenth Amendment, mandates that the accused has the right to present his own witnesses to establish a defense” (People v Carter, 37 NY2d 234, 239-240). The Supreme Court has so stated in a number of cases (Faretta v California, 422 US 806, 818; Chambers v Mississippi, 410 US 284, 294 [noting that "(f)cw rights are more fundamental than that of an accused to present witnesses in his own defense,” id., at p 302]; Jenkins v McKeithen, 395 US 411, 429; Washington v Texas, 388 US 14, 22; see, Westen, Compulsory Process Clause, 73 Mich L Rev 71), as has the New York Legislature in directing that defendant in a criminal proceeding "may as a matter of right call and examine witnesses” (CPL 60.15 [1]). And while most of the cases cited above concern the prospective exclusion of a defense witness rather than a refusal to allow a witness who has been sworn to testify concerning particular facts, there is no less a denial of due process in the latter case than in the former when the excluded evidence affects the fact-finding process as "profoundly and directly” as does the evidence excluded in the present case (see, People v Morales, 37 NY2d 262, 269). Indeed, we have but recently recognized, though without the necessity for reaching the constitutional issue, the "crucial” nature for the defendant of testimony impeaching a prosecution witness who gave "highly damaging” testimony concerning defendant’s admission of guilt (People v Pavao, 59 NY2d 282, 290).
Defendant had the right to present his own testimony concerning what was told him by his mother-in-law, and the *872 testimony of his sister and Sergeant Gathers in rebuttal of the highly damaging testimony of Bobby Glover against him and in explanation of his reason for going to South Carolina. Had that evidence been presented there is a significant probability that disbelief of Glover’s testimony and acceptance of defendant’s explanation of why he fled may have resulted in an acquittal. There should, therefore, be a reversal and a new trial.
Chief Judge Wachtler and Judges Jasen, Simons, Kaye, Alexander and Titone concur; Judge Meyer dissents and votes to reverse in an opinion.
Order affirmed in a memorandum.

. The majority memorandum has Murdock testifying that "[w]hen defendant sat up, gunshots rang out.” But Murdock conceded that he never *870 saw a gun in defendant’s hand, or in his possession that evening, and testified that he heard but two shots.

. Indeed, although the Trial Judge had ruled when the matter first *871 came up that "defendant has an option of explaining anything he wants to explain when he takes the stand,” he struck defendant’s testimony that he learned from his mother-in-law about certain actions of the New York City Police Department and instructed the jury to disregard the question and answer.