[950 NE2d 126, 926 NYS2d 390]

THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v MARCOS A. FERNANDEZ, Respondent.

Argued April 27, 2011; decided June 2, 2011

**POINTS OF COUNSEL**

*D. Holley Carnright, District Attorney*, Kingston (*Joan Gudes-blatt Lamb* of counsel), for appellant. The trial court did not abuse its discretion as a matter of law by prohibiting the defense from offering testimony from family members regarding the child victim's reputation in their "family" for truth and veracity as the "family" was neither sufficiently large nor diverse enough and thus the defense failed to lay a proper foundation. (*People v Hanley*, 5 NY3d 108; *People v Pavao*, 59 NY2d 282; *People v Bouton*, 50 NY2d 130; *People v Hinksman*, 192 NY 421; *People v Hopkins*, 56 AD3d 820; *People v Carter*, 31 AD3d 1167; *People v Streitferdt*, 169 AD2d 171; *People v Young*, 7 NY3d 40; *People v Patterson*, 93 NY2d 80; *People v Welch*, 71 AD3d 1329.)

*Cynthia Feathers*, Saratoga Springs, for respondent. The Third Department properly held that defendant's absolute right to present witnesses regarding the reputation of the complainant for being untruthful was violated, where the witnesses knew her reputation in the community of a large, close-knit, extended family. The error was not harmless, so there must be a new trial. (*People v Pavao*, 59 NY2d 282; *Michelson v United States*, 335 US 469; *People v Barber*, 74 NY2d 653; *People v Hanley*, 5

NY3d 108; *People v Crimmins*, 36 NY2d 230; *People v Hinks-man*, 192 NY 421; *People v Van Gaasbeck*, 189 NY 408; *People v Bouton*, 50 NY2d 130; *People v Colantone*, 243 NY 134; *People v Boyd*, 50 AD3d 1578, 11 NY3d 785.)

## OPINION OF THE COURT

CIPARICK, J.

The issue raised by this appeal is whether County Court improperly deprived defendant of his right to present testimony that complainant had a bad reputation in the community for truth and veracity. We hold that the trial court's decision to exclude such testimony on foundational grounds was an abuse of discretion as a matter of law.

In April 2008, a grand jury charged defendant with course of sexual conduct against a child in the first and second degrees (Penal Law § 130.75 [1] [a]; § 130.80 [1] [a]), rape in the first degree (Penal Law § 130.35 [3]), sexual abuse in the first and second degrees (Penal Law § 130.65 [3]; § 130.60 [2]), and endangering the welfare of a child (Penal Law § 260.10 [1]). The indictment alleged that from August 2005 to December 2005, defendant, who was 17 years old at the time, engaged in sexual conduct with complainant, his then eight-year-old niece. During the relevant time period, defendant resided with his parents, Juan Collazo and Ramona Fernandez, at their home. The allegations set forth in the indictment purportedly took place there, inside defendant's second-floor bedroom.

Defendant proceeded to trial before a jury, which heard conflicting testimony concerning the events in question. Complainant, age 11 at the time of trial, testified that, between August and December 2005, she visited defendant's home more than five times. Her visits to defendant's home typically coincided with weekends and holidays when other members of her family, including complainant's older sister, gathered. Complainant explained that although Ramona Fernandez was her biological great aunt, she referred to her as her grandmother. She similarly called Collazo her grandfather.

On direct examination, complainant recounted that, on at least three occasions between August and December 2005 (but possibly more), she and defendant were alone in his upstairs bedroom. Complainant recalled that, during the first incident, defendant pushed his dresser in front of the bedroom door, undressed himself, and removed her clothing. While complainant sat on his bed, defendant touched and kissed every intimate

part of her body. Defendant also allegedly inserted his penis into complainant's mouth, vagina, and buttocks. Complainant testified that defendant instructed her not to tell anyone about the events that had just transpired. She felt threatened by defendant's admonition and was afraid that defendant would hurt her if she disclosed what had happened.

Complainant's testimony regarding other purported encounters, however, was much less precise. For example, while complainant asserted definitively that defendant disrobed himself and removed her underpants in a second incident, she could not remember any other details. She estimated that the two were alone in defendant's bedroom for about five minutes when her older sister knocked on the door and asked for defendant. After repeatedly knocking for about a minute, complainant's sister, who also testified at trial, entered the room and observed defendant run behind the door and noted that he was not wearing a shirt. Complainant's sister also saw complainant lying in defendant's bed underneath the covers with only her face exposed.

Sometime after December 2005, complainant composed a letter to defendant, which the court admitted into evidence, expressing her anger and hatred toward him. In the letter, complainant wrote, in part, "Why did you hurt me when I was younger? Why did you do that to me? Why did you pick me?" Complainant testified that she was uncertain whether defendant received her letter, but that her intent in writing the letter was to confront him. In the summer of 2007, complainant, for the first time, confided in her sister and cousins. Complainant acknowledged that these family members initially did not believe her. Several months later, in early 2008, she also told her parents and one of her aunts about defendant's alleged sexual abuse. She informed the jury that her reason for not coming forward sooner was that she feared her father would no longer allow her to visit her grandparents.

Defendant, on the other hand, testified that complainant had visited his home on only two occasions between August and December 2005, once for Thanksgiving and once on Christmas. For Thanksgiving, defendant recollected that there was an "entire house full" of relatives and that complainant spent the weekend there. Defendant highlighted that he never had occasion to be alone in his upstairs bedroom during the Thanksgiving holiday weekend. At Christmas, defendant recounted that

complainant merely stopped by the house to retrieve her presents and did not stay overnight. Defendant denied that he had engaged in any sexual conduct with complainant. Moreover, he explained that his parents had a house rule, which prohibited a child from going upstairs unless he or she had to use the bathroom, in which case, the child had to advise an adult. Finally, defendant described that complainant was not "the easiest person for me to deal with" and "bothersome."

Defendant's parents also testified on his behalf. They corroborated defendant's testimony that the only two times complainant visited their home during the period alleged in the indictment was during the Thanksgiving and Christmas holidays. Collazo and Ramona Fernandez also confirmed that they generally did not permit any of the children who visited their home to go upstairs. In addition to their factual testimony, defense counsel sought to introduce testimony from both Collazo and Ramona Fernandez that complainant—whom they considered their granddaughter—had a reputation for untruthfulness among their family and family friends. To that end, Collazo testified that he had known complainant for all of her life and that he had regular contact with her. Collazo also testified that he had heard practically all 25 to 30 members of his family, many of whom he identified, discuss complainant during the time he knew her. Although he could not specify the number of conversations that he overheard, he was aware of complainant's reputation for truthfulness among the family. When defense counsel asked Collazo to state that reputation, County Court sustained the People's objection to this question on the ground that defense counsel had not laid a proper foundation.

Similarly, Ramona Fernandez testified that she knew complainant since birth and that all of her family members, including her sisters and nieces, watched her grow up. She explained that her family and family friends "always talk[ed] about the children" when they were around and that, at times, they specifically discussed complainant's reputation for truthfulness. Again, when defense counsel asked the witness to state what that reputation was, the People objected and argued both improper foundation and that complainant's family members and friends did not constitute "a community at all." County Court sustained the objection, precluding further testimony.

The jury convicted defendant of first and second degree sexual abuse and endangering the welfare of a child, but acquitted him of the more serious charges of first degree rape and first and

second degree course of sexual conduct against a child. Defendant moved to set aside the verdict pursuant to CPL 330.30, contending that the trial court erred in precluding the defense from eliciting testimony regarding complainant's reputation in the community for truth and veracity.

In a written decision, the trial judge denied the motion and adhered to his evidentiary rulings at trial, reasoning that "because . . . defendant did not establish the 'quality' of the community member[s'] associations with [complainant], he failed to establish[ ] the reliability of his proposed witnesses' testimony or lay a foundation for its introduction into evidence." (2009 NY Slip Op 33256[U], *3.) Following the court's denial of defendant's CPL 330.30 motion, he was sentenced to an aggregate term of four months jail followed by 10 years probation. Pending appeal, defendant applied for a stay in the execution of his sentence, which the Appellate Division granted.

The Appellate Division, with two Justices dissenting in part, reversed the judgment of conviction and sentence. As a threshold matter, the court concluded that defendant's conviction for second degree sexual abuse must be reversed and that count of the indictment dismissed because it was "an inclusory concurrent count of the one charging him with sexual abuse in the first degree" (*People v Fernandez*, 74 AD3d 1379, 1380 [3d Dept 2010]).[1] The court further held that "County Court improperly precluded [defendant] from presenting testimony of two family members regarding the complainant's reputation in their family for untruthfulness" (*id.*). Specifically, the court reasoned that, contrary to the trial court's conclusion, the testimony elicited from Collazo "provided an adequate foundation for the reputation testimony" (*id.* at 1381). Moreover, the court noted that the trial court erred in precluding Ramona Fernandez's testimony "on the basis that the family was not a community for purposes of reputation testimony" (*id.*). Finally, the Appellate Division observed that the error in precluding such testimony was not harmless since the People's case hinged on complainant's credibility (*see id.*).

The dissenting Justices agreed that the second degree sexual abuse count was an inclusory count warranting reversal and dismissal, but would have affirmed the judgment of conviction and sentence with respect to the first degree sexual abuse and

---

1. On appeal to this Court, the People do not challenge the Appellate Division's dismissal of the second degree sexual abuse count.

endangering the welfare of a child counts. The dissenters opined that the trial court did not "abuse[ ] its discretion in ruling that the foundational testimony of the proposed character witnesses was insufficient to allow admission of reputation evidence in this case" (*id.* at 1382). A Justice of the Appellate Division granted the People leave to appeal (15 NY3d 780 [2010]), and we now affirm.

We have long held that "a party has a right to call a witness to testify that a key opposing witness, who gave substantive evidence and was not called for purposes of impeachment, has a bad reputation in the community for truth and veracity" (*People v Pavao*, 59 NY2d 282, 290 [1983]). Indeed, a "trial court must allow such testimony, once a foundation has been laid, so long as it is relevant to contradict the testimony of a key witness and is limited to general reputation for truth and veracity" (*People v Hanley*, 5 NY3d 108, 112 [2005]). The purpose of this rule is to "ensure[ ] that the jury is afforded a full picture of the witnesses presented, allowing it to give the proper weight to the testimony of such witnesses" (*id.*).

In *People v Bouton* (50 NY2d 130 [1980]), we rejected the notion that one's community was restricted to "one's residential neighborhood" (*id.* at 140 [internal quotation marks omitted]). Rather, we observed that "[a] reputation may grow *wherever* an individual's associations are of such quantity and quality as to permit him to be personally observed by a sufficient number of individuals to give reasonable assurance of reliability" (*id.* at 139 [emphasis added]). For example, we have concluded that a witness' bad reputation for truth and veracity at his place of employment "can be probative and reliable" (*Hanley*, 5 NY3d at 113; *see also Bouton*, 50 NY2d at 139 [an individual "might be better known in the community of his employment and in the circle of his vocational fellows, where opportunities to evidence the traits at stake may occur with greater frequency than in the environs of his dwelling place, nestled in the anonymity of a large city or suburb"]; *cf. People v Colantone*, 243 NY 134, 139 [1926] [finding "individual and independent dealings" insufficient foundation for the admissibility of general reputation evidence]).

Once the party seeking admission of reputation evidence has laid the proper foundation, it is for the jury to evaluate the credibility of the character witnesses who testify, and to decide how much weight to give the views reported in their testimony. While a "reasonable assurance of reliability" (*Bouton*, 50 NY2d

at 139) is necessary for a proper foundation, such reasonable assurance exists where the testifying witnesses report the views of a sufficient number of people, and those views are based on sufficient experience with the person whose character is in question. Reputation evidence may be reliable within the meaning of *Bouton*, but still questionable from a credibility standpoint. This possibility, however, is not a proper basis for exclusion of reputation evidence. Reliability—whether a character witness has established a proper basis for knowing a key opposing witness' general reputation for truth and veracity—is a question of law for the court. By contrast, the credibility of such character witness—whether that witness is worthy or unworthy of belief or is motivated by bias—is a factual question for the jury. We caution that a trial court should not use reliability as a ground for excluding evidence it believes is not credible.

Applying these principles, we begin by emphasizing that the material issue at trial was complainant's credibility. After all, complainant's testimony regarding the sexual abuse was the only proof adduced by the People to establish that defendant sexually abused complainant. To undercut complainant's version of events, defendant sought to introduce evidence, through his parents, that complainant had a bad reputation for truth and veracity among her family. Until today, we have never had occasion to decide whether family and family friends could constitute a relevant community for purposes of introducing testimony pertaining to an opposing witness' bad reputation for truth and veracity. Assuming the proper foundation has been laid, we conclude that family and family friends can constitute a relevant community for such purpose.

Here, Collazo and Ramona Fernandez's respective testimony laid the proper foundation for reputation evidence. Collazo testified that he had known complainant since her birth and that they were members of the same large extended family, comprising approximately 25 to 30 people. Collazo identified many of these family members and indicated that his entire family knew complainant. Collazo overheard discussions among them concerning complainant and was aware of her reputation for truthfulness in the family. Likewise, Ramona Fernandez explained that she had known complainant since her birth and that she, along with many of her other family members and friends, witnessed complainant grow up. She further testified that all her family members and family friends often discussed

complainant and that she was present during such conversations. Like Collazo, she testified that she was aware of complainant's reputation for truthfulness among this group. We conclude that this foundational testimony more than adequately formed the basis for admitting into evidence further testimony pertaining to complainant's bad reputation for truth and veracity in the community (*see Hanley*, 5 NY3d at 113).[2]

Nevertheless, the People argue (and our dissenting colleagues agree) that County Court did not abuse its discretion in precluding this reputation evidence because Collazo and Ramona Fernandez's testimony would have been inherently unreliable, given their purported bias in favor of defendant. But under our precedents, the presentation of reputation evidence by a criminal defendant is a matter of right, not discretion, once a proper foundation has been laid. We observe that both witnesses had familial relationships with defendant as well as complainant. Indeed, complainant referred to the witnesses as her grandparents and routinely visited their home. In fact, complainant testified that she refrained from telling her father about defendant's alleged sexual conduct in fear that he would no longer permit her to see her grandparents.

Thus, had the court admitted this reputation testimony into evidence, we agree with the Appellate Division that the People could have explored whether Collazo and Ramona Fernandez actually exhibited a bias in defendant's favor through the cross-examination of these witnesses. County Court's decision to exclude this evidence deprived the jury from undertaking a meaningful assessment of complainant's credibility. Since complainant's credibility was the central issue for the jury to resolve, County Court's failure to admit evidence related to complainant's bad reputation for truth and veracity cannot be considered harmless. Defendant, therefore, is entitled to a new trial.

Accordingly, the order of the Appellate Division, insofar as appealed from, should be affirmed.

---

2. The dissent's position that, as a matter of law, "a family is too insular and self-interested a grouping to provide a reliable community" (dissenting op at 80) is an unwarranted departure from our precedent. Whether a particular association constitutes a community is an assessment that ought to be made on a case-by-case basis. As already noted, the inquiry in determining whether reputation evidence should be admitted into evidence is whether "an individual's associations are of such quantity and quality as . . . to give reasonable assurance of reliability" (*Bouton*, 50 NY2d at 139). Complainant's associations with her 25-to-30-person family and family friends meet this test.

GRAFFEO, J. (dissenting). In this child sex abuse case, defendant Marcos Fernandez sought to introduce testimony at trial that complainant, his young niece, had a poor reputation in their family for veracity. The trial court barred the evidence for lack of a proper foundation based, as relevant here, on its determination that the family was not a reliable community for purposes of establishing a reputation. Following defendant's conviction on three counts, the Appellate Division reversed and ordered a new trial (74 AD3d 1379 [2010]), concluding that defendant was entitled to present such evidence, and a majority of this Court now affirms that ruling. Because I believe that the trial court did not err in precluding defendant's proffered reputation testimony under the circumstances of this case, I respectfully dissent.

As the majority correctly recounts, it is well settled that a witness may be impeached by evidence of a bad reputation in the community for truth and veracity "once a foundation has been laid" (*People v Hanley*, 5 NY3d 108, 112 [2005]). We have cautioned, however, that a proper foundation for such evidence requires a showing that the proposed testimony has a "reasonable assurance of reliability" (*People v Bouton*, 50 NY2d 130, 139 [1980]). It is on this point that I diverge from the analysis of the majority.

Typically, the reliability inquiry focuses on whether the associations of the witness whose credibility is at stake "are of such quantity and quality as to permit him to be personally observed by a sufficient number of individuals" (*id.*). But the identity of the "community" is also relevant to a court's determination of admissibility (*see Hanley*, 5 NY3d at 113 [the community must be "probative and reliable"]). We have held that a witness's reputation in a number of different settings can be probative, including reputations formed in a residential neighborhood (*see People v Van Gaasbeck*, 189 NY 408, 418-419 [1907]); the business community (*see Bouton*, 50 NY2d at 140); a vocational school or army post (*see People v Colantone*, 243 NY 134, 137-138 [1926]); and, most recently, a place of employment (*see Hanley*, 5 NY3d at 113). Notably, however, no New York case has ever addressed whether the family of a witness can constitute a reliable community, particularly the family of a pre-adolescent child witness.

Other jurisdictions have been wary of treating families as communities for purposes of introducing testimony regarding a witness's reputation for untruthfulness. In fact, courts have

repeatedly held that it is proper to exclude evidence sought to be offered by relatives because "the inherent nature of familial relationships often precludes family members from providing an unbiased and reliable evaluation of one another" (*State v Gregory*, 158 Wash 2d 759, 805, 147 P3d 1201, 1226 [2006]; *see also State v Ricker*, 770 A2d 1021, 1024 [Me 2001] [trial court committed no error in preventing testimony of family members as to the reputation of the sexual abuse victim, defendant's niece, for untruthfulness within the family]; *Adcock v Commonwealth*, 702 SW2d 440, 445 [Ky 1986] ["(A) witness cannot testify as to general reputation based solely upon what family members have stated to him or in his presence. General reputation in the community may be entirely different from the regard in which he is held by family members. It is only general reputation about which testimony can be received"]; *Gonzalez v State*, 871 So 2d 1010, 1011 [Fla Dist Ct App 2004], *review denied* 886 So 2d 226 [Fla 2004] ["A person's family is too narrow a segment of the community to be the source of reputation testimony"]; *State v Berry*, 2002 WL 31757250, *1, 2002 Iowa App LEXIS 1302, *2 [Ct App 2002] ["A crucial foundational requirement for such testimony is that the reputation must be not among a limited group such as a family, but that of a general cross-section of the community where the witness lives or works"]).

I share these concerns and would hold that a family is too insular and self-interested a grouping to provide a reliable community under our jurisprudence. The circumstances of this case well illustrate the inherent problems in characterizing a witness's family as a "community." The evidence defendant offered to impeach the reputation of the child complainant—who was only eight years old at the time of the crime—was to be given by defendant's parents, Juan Collazo and Ramona Fernandez. It goes without saying that there is ·a keen danger of blatant bias when a defendant's parents are called to give testimony pertaining to the reputation of their son's accuser.

These concerns are only magnified where, as here, the reputation of a young child is at issue. Children are dependent on their families for support and guidance, care and protection, and acceptance and affection—all factors essential to the emotional well-being of a child. It is questionable whether even an older adolescent could weather this form of public criticism from close relatives impugning his or her character and trustworthiness within the family unit. But, clearly, the

trust relationship necessary for healthy child development is seriously eroded when a young girl eventually discovers that she has been labeled a liar and a troublesome child by the very individuals she views as her "grandparents." And to what end? Are we to believe that a jury will alter its view of the facts because a defendant's parents testify on a topic as subjective as a child complainant's reputation for truth or veracity? I believe jurors will readily comprehend the inherent and unavoidable bias presented by a parent providing such testimony on behalf of a son or daughter accused of having committed a crime.

Every defendant is entitled to present a defense, and the veracity of complainant was undoubtedly of paramount concern to the defense in this case. I am not, therefore, suggesting that a child should not be the subject of reputation testimony. But there are numerous other community sources capable of providing testimony regarding a child's veracity and behavioral problems that are not of dubious reliability, would carry more credibility with a jury, and are not as likely to unjustifiably damage the child's psychological well-being. Teachers, pediatricians, school psychologists, neighbors, coaches, troop leaders or any person in a relevant community who has consistent and meaningful contact with a child can potentially address the child's reputation for truthfulness. In the search for truth, we need not sever whatever remains of the child's emotional dependence on close relatives or encourage an intrafamily battle of biased witnesses.

For all of these reasons, I believe that the trial court in this case was warranted in determining that the requisite "reasonable assurance of reliability" (*Bouton*, 50 NY2d at 139) was lacking. In reaching the opposite conclusion, the majority establishes a troubling precedent under which a trial judge commits reversible error by not allowing a defendant's parent to testify that a child complainant in a sex abuse case has a reputation in the defendant's family for not telling the truth. I cannot subscribe to such a rule nor do I think it is compelled by our precedents.

Consequently, I would reverse the order of the Appellate Division, insofar as it is appealed from, and remit to the Appellate Division for consideration of the facts and issues raised but not decided on the appeal to that court.

Judges READ, SMITH, PIGOTT and JONES concur with Judge CIPARICK; Judge GRAFFEO dissents and votes to reverse in a separate opinion in which Chief Judge LIPPMAN concurs.

Order, insofar as appealed from, affirmed.